672 A.2d 162

Gregory CONAWAY

v.

STATE of Maryland.

No. 798, Sept. Term, 1995.

Court of Special Appeals of Maryland.

March 1, 1996.

476

478

Samuel D. Hill (Hill, Foley, Stone & Miles, all of Towson and David Kimmelman, Baltimore, on the brief), for Appellant.

Susan L. Howe, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for Appellee.

Argued before MOYLAN, BISHOP and EYLER, JJ.

EYLER, Judge.

This is an appeal by Gregory Conaway from a judgment entered in favor of the State of Maryland, following a non-jury trial before Judge John Carroll Byrnes in the Circuit Court for Baltimore City. The issue before us is whether the trial judge correctly concluded that the State was immune from suit for damages as a result of negligent medical care received by appellant while he was an inmate in the custody of the Maryland Division of Correction. The health care providers were employed by a private company that supplied health care employees pursuant to a contract with the State. More specifically, the sole question for our decision is whether the health care providers were "State personnel" within the meaning of Md.Code (1984, 1995 Repl.Vol.), § 12–101(1) or (4) of the State Government Article (S.G.), the Maryland Tort Claims Act. We answer that question in the negative and affirm the ruling of the trial judge.

## I.

More than nine years after the injury that gave rise to this litigation, the parties are still wending their way through our judicial system. The underlying facts may be found in Judge Rosalyn Bell's opinion in Conaway v. State, 90 Md.App. 234, 237–39, 600 A.2d 1133 (1992). We will not repeat the entire history of this litigation, but a brief review may be helpful in understanding its present posture.

Appellant injured his hand while incarcerated at the Brockbridge Correctional Facility in May, 1986, and was treated at that Facility's dispensary. He filed a claim with the Health Claims Arbitration Commission and then a suit against Frank G. Basil, Inc. of Delaware, a health care company that the State contracted with to provide health care services to in-

mates at certain facilities, including Brockbridge, through June 30, 1986, and PHP Health Care Corporation, the contractor hired to provide such services subsequent to that date.

In the first *Conaway*, the issues were whether appellant had made a written claim against the State in compliance with S.G. § 12–106(b) and whether the claim against Basil was barred by limitations. *Id.* at 239–54, 600 A.2d 1133. We held that appellant had given the State adequate notice of his claim but that the claim against Basil was barred by limitations. This Court remanded the case to the Circuit Court for Baltimore City for further proceedings consistent with our opinion.

Subsequent to our remand, the Circuit Court for Baltimore City remanded appellant's case to the Health Claims Arbitration Office ("HCAO"). The HCAO granted defendant PHP Health Care Corporation's motion for summary judgment on the ground that the negligent acts occurred prior to its involvement. This left the State as the sole defendant. Thereafter, on November 15, 1993, the panel issued its decision. The panel found the State liable to appellant and awarded to him: (1) $5,980 for future medical expenses; (2) $2,000 for past lost earnings and $15,000 for future lost earnings; and (3) $2,020 for non-economic damages. Additionally, the panel assessed costs against the State in the amount of $1,247.99.

On December 27, 1993, the State filed an action to "Nullify Award and Assessment of Costs" in the Circuit Court for Baltimore City. In response, on January 10, 1994, appellant filed a complaint, in which he claimed damages totaling $75,-000. The parties' dispute survived motions for summary judgment and proceeded to a bench trial.

Prior to trial, the parties agreed that, if appellant prevailed, he would receive $18,000 in damages. The parties further agreed that they would proceed on the one issue as stated above. Although the parties did not explicitly stipulate that the health care provider or providers in question were negligent, it appears that they proceeded to trial with that assump-

tion. In any event, the issue is not raised, and we shall assume that the negligent acts occurred prior to June 30, 1986. Moreover, the parties do not raise an issue with respect to the fact of, or the basis for, the State's liability for the negligent acts of the health care providers. Appellant does argue that the State had a duty to render adequate medical care to inmates and that this was a non-delegable duty. Additionally, appellant argues that there was a "holding out" of the health care providers as agents of the State. Either or both of these doctrines, if applicable, would give rise to vicarious liability on the part of the State. We do not decide if a legal basis for liability exists on either of those theories, since the issue presented by the parties implicitly assumes (without conceding) a basis for tort liability by the State.[1]

At trial, appellant testified that he did not know whether he was treated by State employees or by employees of Basil. The State presented two witnesses, Myles Carpeneto and Larry Andersson. Carpeneto and Andersson were, respectively, at the relevant times, Director of Procurement Services for the Department of Correction and Chief of Personnel Services for the Department of Correction. They testified, in part, that no State employees were assigned to provide health care at Brockbridge when appellant received negligent treatment.

At the conclusion of the trial on February 16, 1995, the trial judge held the matter *sub curia*. Approximately one month later, the trial judge filed his opinion and entered judgment against appellant. Appellant timely noted this appeal.

Our discussion centers upon the Maryland Tort Claims Act ("Act"), which took effect on July 1, 1982. See Md.Code (1981

---

1. *See State v. Johnson,* 108 Md.App. 54, 670 A.2d 1012 (1996), wherein this Court held that the State has no duty to create an individualized plan to provide medical care for an inmate. This Court expressly did not decide the State's liability for actions of employees of independent contractors.

Cum.Supp.), §§ 5–401 to 5–408 of the Courts Article.[2] As stated in the preamble to Senate Bill 585, the legislation was proposed for

> [t]he purpose of waiving the immunity of the State and its officials in certain tort actions to the extent that the State is insured; granting certain State personnel immunity from liability as individuals for such torts absent certain circumstances; providing for the representation of the State and its personnel in such cases; requiring the filing of a claim with the State Treasurer as a prerequisite to the waiver of such immunity; authorizing the Treasurer to consider, ascertain, adjust, determine, compromise, and settle such claims and contract for services; limiting the fees which attorneys may charge in such matters; directing the Treasurer to secure insurance for such purposes to the extent that funds are available; and generally relating to the immunity of the State and its personnel in tort.

1981 Md.Laws chap. 298, page 1609. Moreover, the Legislature specifically declared that the Act was to be liberally interpreted.

The Act has been amended from time to time, including significant amendments in 1989, which would clearly resolve the issue herein, if applicable. The negligent acts in question occurred prior to July 1, 1986. Appellant's claim was filed in September, 1986. *See Conaway*, 90 Md.App. at 250, 600 A.2d 1133. As the trial judge in this case noted, the 1989 amendments to the Act took effect on July 1, 1989 and are inapplicable to this case.[3]

---

**2.** In 1984, the General Assembly amended and recodified the Act as S.G. §§ 12–101 to 12–109, where it is now found. *Condon v. State*, 332 Md. 481, 492 n. 3, 632 A.2d 753 (1993); S.G. §§ 12–101 to 12–110.

**3.** See the discussion in *State v. Card*, 104 Md.App. 439, 656 A.2d 400, *cert. denied*, 339 Md. 643, 664 A.2d 886 (1995), wherein we held that the 1989 amendment applied to claims made after the effective date of the amendment even though the underlying event occurred earlier. In this case, the event occurred, and the claim was made, prior to the effective date of the 1989 amendment.

**484**

## II.

Under the Act, the State has waived immunity under certain circumstances with respect to negligent acts committed by State personnel. The issue presented to us requires us to focus on two provisions of the Act defining "State personnel," §§ 12–101(1) and 12–101(4). Under subsection (1), an individual is within the definition of "State personnel" if a "classified," "unclassified," or "contractual employee" of the State, or under subsection (4), if the individual "exercises a part of the sovereignty of the State."

Appellant's first point relates to S.G. § 12–101(1). We look to that section as it existed prior to the 1989 amendments:

In this subtitle, unless the context clearly requires otherwise, 'State personnel' means:

(1) a classified, unclassified, or contractual employee of the State whose compensation is paid wholly or partly from State funds....

Md.Code (1984), § 12–101(1) of the State Government Article.[4] In his brief, however, appellant makes no argument regarding that section's applicability to this case. Instead, he refers us to the joint record extract and to a memorandum appearing at the cited page, which was filed in the Circuit Court for Baltimore City. The argument in the memorandum is not clear, but it appears as though appellant asserts that S.G. § 12–101(1) is germane to this litigation because Basil's employees were "contractual employee[s] of the State whose compensation is paid wholly or partly from State funds...." The short answer to this assertion is that, in the absence of

---

4. The 1989 revision to § 12–101(1) reads as follows:

In this subtitle, unless the context clearly requires otherwise, 'State personnel' means:

(1) A State employee or official who is paid in whole or in part by the Central Payroll Bureau in the Office of the Comptroller of the Treasury....

Md.Code (1984, 1989 Cum.Supp.), § 12–101(1) of the State Government Article.

argument in the brief, the point need not be considered by this court. *Beck v. Mangels,* 100 Md.App. 144, 640 A.2d 236 (1994), *cert. denied,* 337 Md. 580, 655 A.2d 370 (1995). The longer answer is that appellant is mistaken. We shall examine the argument because it aids our discussion of the main issue.

In analyzing appellant's arguments, we are guided by the basic principles of statutory construction as set forth by Chief Judge Murphy in *Condon:*

> The cardinal rule of statutory construction is to ascertain and carry out the true intention of the legislature. In searching for legislative intention, a court looks for the general purpose, aim, or policy behind the statute. We first look to the plain meaning of the language of the statute to discern legislative intent. Where the language is clear and unambiguous, a court may not add or delete words to make a statute reflect an intent not evidenced in that language to avoid a harsh result. A clearly worded statute must be construed without 'forced or subtle interpretations' that limit or extend its application. The language must be examined in the context in which it was adopted. All parts of a statute are to be read together to determine intent, and reconciled and harmonized to the extent possible. If reasonably possible, a statute should be read so that no part of it is rendered nugatory or superfluous. Where a statute may be susceptible of more than one meaning, the court may consider the consequences of each meaning and adopt that construction which avoids a result that is unreasonable, illogical or inconsistent with common sense. It often is necessary to look at the development of a statute to discern legislative intent that may not be as clear upon initial examination of the current language of the statute.

*Condon,* 332 Md. at 490–91, 632 A.2d 753 (citations omitted); *Morris v. Osmose Wood Preserving,* 340 Md. 519, 538–39, 667 A.2d 624 (1995).

The pre–1989 Act did not provide definitions of "classified, unclassified, or contractual" employees. Appellant's counsel stated at oral argument that no claim is being made that

Basil's employees were "classified" or "unclassified" employees of the State. We turn to the Merit System law then in existence for clarification of "contractual" employees.[5]

Section 15A of former Article 64A defined "contractual employee."

(2) 'Contractual *employee*' means a person providing personal services to the State for remuneration provided that:

(i) The services and remuneration are specified in a written agreement;

(ii) An employer-employee relationship exists; and

(iii) The person is not employed as a classified, unclassified or temporary extra employee.

(3) *'Employer-employee relationship'* means conditions of employment such that:

(i) The State has the right to control and direct the performance of services, not only as to results but also as to details and means;

(ii) The State has the right to discharge the employee; and

(iii) The State furnishes necessary tools and a place to work.

Md.Code (Cum.Supp.1986), Art. 64A, § 15A.

At trial, Carpeneto explained the distinction between a contractual employee and an independent contractor's employee.

Q Okay could you please explain the difference between a contractual employee and an employee of a contractor or a company with whom the State contracts?

A Sure. And—a contractual employee is an employee of the State of Maryland. We pay their social security, take out their taxes. As far as Internal Revenue Service is concerned, they are a State employee. As employer contractor, we don't actually contract with the employees, we

---

5. For a current set of definitions, see Md.Code (1994), § 1–101 of the State Personnel and Pensions Article.

contract with the contractor himself. So in this case it was Frank E. Basil Incorporated. And Frank E. Basil then had employees and paid their social security and taxes and whatever.

And for the IRS purposes, they were employees of Frank E. Basil as opposed to employees of the State of Maryland.

The trial judge found that the medical personnel at Brockbridge at the pertinent time were not State employees. This finding was supported by uncontradicted evidence and is not clearly erroneous. Additionally, the above discussion makes clear, based on the plain language of the statute, that an employee of an independent contractor is not a "contractual employee" of the State. Thus, the trial judge's conclusion with respect to this point will not be disturbed.

### III.

Appellant's second point is grounded in S.G. § 12–101(4), which includes, within the definition of "State personnel," the following:

> (4) an individual who, with or without compensation, exercises a part of the sovereignty of the State.[6]

It is helpful to review the common law doctrine of immunity prior to the Act and the history of the Act. At common law, public employees were not immune from suit for negligence, but public officials were immune from such suits, if based on discretionary, as opposed to ministerial, acts, and if they were in furtherance of official duties. The State was immune from liability, absent consent. Pursuant to the Act, the State waived its immunity in certain instances and, where waiver was applicable, the individual was immune. The original version of the Act waived immunity in certain specified actions

---

**6.** The General Assembly amended this section, effective July 1, 1989, to read as follows:

> (4) an individual who, without compensation, exercises a part of the sovereignty of the State....

Md.Code (1984, 1990 Cum.Supp.), § 12–101(4) of the State Government Article.

to the extent and in the amount that the State was covered by a program of insurance established by the Treasurer. Six categories of actions were listed. The 1985 amendment broadened the waiver of immunity, waiving it with respect to all types of tort actions for damages to the extent of coverage, based on acts committed by "State personnel," subject to the limitations contained in S.G. § 12–104(b).

The Court of Appeals discussed subsection (4) as it existed prior to the 1989 amendments in *Rucker v. Harford County,* 316 Md. 275, 558 A.2d 399 (1989). The issues presented in *Rucker* came in the form of certified questions from the United States District Court for the District of Maryland. A stray bullet fired by a peace officer initiated appellant David Rucker's claim. The court had before it the question of

> [w]hether Harford County or the State of Maryland is obligated to fund the expenses associated with claims for liability involving the Harford County Sheriff, the Deputy Sheriffs, or the Sheriff's office, including the cost of liability insurance, the costs of defending suits brought against them and the payment of any settlements and judgment[.]

*Rucker,* 316 Md. at 278, 558 A.2d 399. The discussion is enlightening.

> Subsection (4) of § 12–101 literally covers sheriffs and deputy sheriffs, and the Attorney General does not argue otherwise. Rather, the Attorney General contends that subsection (4) should not be given a literal construction, as this would render the State liable for the tortious acts of public officials and employees at every level of government, including many whose offices were created by local charters or local ordinances. . . .
>
> We agree with the Attorney General that subsection 4 of § 12–101 cannot reasonably be read to encompass every individual exercising part of the sovereignty of the State. Many county and municipal officials and employees could be said to exercise part of the sovereignty of the State. The General Assembly, in enacting § 12–101(4), obviously did not contemplate that the State was assuming liability for the

torts of purely local government officials and employees. If it had, there would have been little reason to enact the Local Government Tort Claims Act or other legislation relating to the tort liability of local government personnel. As § 12–101 deals with 'State personnel,' § 12–101(4) should be limited to those who are State officers or employees, or to those directly acting for the State Government rather than for a county or municipality. . . .

Subsection (4) of § 12–101, by referring to those exercising a part of the sovereignty of the State, and by making the matter of compensation irrelevant, seems particularly applicable to State officers like sheriffs, state's attorneys, orphans' court judges, and similar officials, who are performing fundamental State government functions but who may not be compensated by the State government. It seems to have been specifically designed to cover these personnel, based upon the language used and the fact that virtually all other categories of State personnel appear to be encompassed by other subsections.

*Id.* at 298–300, 558 A.2d 399 (footnote omitted).

The Court of Appeals did not decide the question before us, however. It did not indicate what was meant by "directly acting for the State." Additionally, the Court did not state that subsection (4) is *limited* to "sheriffs, state's attorneys, orphans court judges, and similar officials, who are performing fundamental state government functions," *id.* at 300, 558 A.2d 399, only that it included such persons.

■ We must now decide what is meant by exercising "part of the sovereignty of the State," as applied to the facts before us. The ordinary meaning of the word "sovereignty" carries with it something more than an act that inures to the benefit of the State or directly or indirectly furthers a State interest. The dictionary definition of the term includes "[s]upremacy in respect of power, domination, or rank; supreme dominion, authority, or rule . . . [t]he supreme controlling power in communities not under monarchical govern-

ment...." XVI *The Oxford English Dictionary* 79 (2d ed. 1989).

State sovereignty must arise in either the executive, judicial, or legislative branch, and flow therefrom to those empowered to exercise it. *Board of Supervisors v. Attorney General,* 246 Md. 417, 229 A.2d 388 (1967). The Department of Correction is part of the executive branch. Md.Code (1986 Repl.Vol., 1995 Supp.), Art. 41, § 4–105. The "[m]anaging official" is responsible for the operation of a correctional facility. Those duties include caring for inmate housing and sanitation.

B. Inmate Safety. It is in the best interest of the general public, correctional administrators, and the appropriate governmental authorities that the life, health, and safety needs of the incarcerated population are met on a continuing basis. Fire prevention and protection services, medical, dental, and mental health care services, and the protection against other life-threatening or health endangering conditions are essential to the effective administration, sound management, and efficient operation of a correctional facility. A safe correctional facility ensures the welfare of staff, visitors, and inmates. The managing official of a facility shall:

. . . . .

(7) Ensure that 24 hour emergency medical services are available ...

(10) Have a written policy and procedure ensuring that the methods for gaining access to health care services are communicated to all inmates and appropriate facility personnel ...

(16) Ensure that all health care personnel who provide services to inmates adhere to the appropriate State licensing, certification, or registration requirements ...

(17) Have a written policy specifying that matters of medical, psychiatric, and dental judgment are the province of qualified health care personnel ...

(19) Have a written policy and procedure providing for the periodic health examination of inmates . . .

COMAR 12.14.04.02B(7), (10), (16), (17), & (19) (1986).[7] The subsections quoted above are indicative of the managing official's responsibility pertaining to inmate health. "Qualified health care personnel" do not have the authority to make policy or operational decisions.

(8) 'Qualified health care personnel' means physicians, dentists, psychiatrists, psychologists, nurses, and other professional persons licensed, registered, or certified according to State requirements to practice the duties and functions appropriate to their qualifications.

COMAR 12.14.04.01B(8) (1982).[8]

The contract between the State and Basil allowed Basil to have a Chief Medical Officer to supervise Basil's "provision of medical services under the contract," and an Administrative Coordinator "responsible for the implementation of services" by Basil. Those individuals were, however, subject to the Division of Correction's direction.

All determinations to be made by the Division pursuant to this contract, excepting those expressly reserved to the Procurement Officer in COMAR, Title 21, shall be made by the Director of Medical and Mental Health Services or his/her designee. Further, the Contractor shall take direction from the Director of Program Services or his/her

---

**7.** COMAR 12.14.04 sets forth the "Minimum Standards for Adult Correctional Institutions[.]" On October 1, 1995, the Secretary of Public Safety and Correctional Services repealed regulations .01 and .02 and adopted new regulations .01 to .08 that became effective December 4, 1995. Md. Register 22:24 at 1900 (Nov. 24, 1995); Md.Register 22:15 at 1155–62 (July 21, 1995). See COMAR 12.12.04.02A (1995).

**8.** *Cf.* COMAR 12.14.04.02B(12) (1986) ("Have a written policy and procedure for the dispensing of prescribed medication in accordance with guidelines recommended by the Board of Pharmacy or as specified by the physician who is the facility medical authority[.]"). *See* COMAR 12.14.04.02A(7)–(9) (1995); *see supra* note 9; see COMAR 12.14.01.01B(66) (1995).

designee with respect to its performance or its obligations under this contract.

Contract at 70.

According to the testimony elicited at trial, the health care providers who treated Conaway's injured finger practiced the duties and functions appropriate to their qualifications. The contract between the State and Basil required Basil to supply health care providers to render proper medical service. No evidence was presented to show that they engaged in any activity peculiar to a governmental power or obligation. The tortious acts amounted to medical malpractice.

We return to a discussion of the common law as it relates to the interpretation of the Act. In *Artis v. Cyphers,* 100 Md. App. 633, 642 A.2d 298, *aff'd,* 336 Md. 561, 649 A.2d 838 (1994), Chief Judge Wilner examined the common law doctrine of public immunity and "the kinds of rulings that must be made in determining whether a public employee is entitled to public official immunity." *Id.* at 639, 642 A.2d 298. In the opinion, Chief Judge Wilner quoted from the instructions found in *James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173 (1980).

Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties....

[W]e set forth the following principal guidelines to be used in [determining whether an individual is a public official]:

(i) The position was created by law and involves continuing and not occasional duties.

(ii) The holder performs an important public duty.

(iii) The position calls for the exercise of some portion of the sovereign power of the State.

(iv) The position has a definite term for which a commission is issued and a bond and an oath are required.

*Id.* at 323–24, 418 A.2d 1173. The guidelines "are not conclusive, and the emphasis which may be placed on each varies depending upon the circumstances present in each case." *Id.* at 324, 418 A.2d 1173. There exist at least two "well-known exceptions" to the four guidelines. *Id.* As stated by Judge Barnes, for the Court of Appeals,

[t]he exceptions where an individual fails to meet most of the above tests, and yet is nevertheless considered to be a public official, are limited to those individuals who exercise 'a *large portion* of the sovereign power of government' ... and to those individuals who can be called on to exercise police powers as conservators of the peace.

*Duncan v. Koustenis,* 260 Md. 98, 106, 271 A.2d 547 (1970). A further distinction exists between discretionary and ministerial actions.

[A]n act falls within the discretionary function of a public official if the decision which involves an exercise of his personal judgment also includes, to more than a minor degree, the manner in which the police power of the State should be utilized.

*James,* 288 Md. at 327, 418 A.2d 1173. Public officials' discretion "is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience, and uncontrolled by the judgment or conscience of others." *Schneider v. Hawkins,* 179 Md. 21, 25, 16 A.2d 861 (1940).

 Appellant argues that the Act does not perpetuate the distinction between public officials and public employees. We agree that the distinction is not specifically maintained, but the waiver of immunity remains a limited, and not a general, waiver. Appellee contends that subsection (1) corresponds with the common law public employee category and subsection (4) corresponds to the common law public official category. We do not agree with that assertion. Subsection (1) applies to employees but, in our view, the question of

whether an individual is within subsection (4) turns on the question of whether the individual is exercising part of the "sovereignty of the State," without necessarily being a *public official* as previously defined. As stated above, there were four principal guidelines to be used in determining whether an individual was a public official. Only one of the guidelines is expressly retained by the Act, *i.e.,* whether the position calls for the exercise of some portion of the sovereign power of the State. If an individual comes within this language, the individual need not necessarily meet the other requirements to be a public official. In other words, in order for an individual to come within subsection (4), he or she must perform some function that is part of the exercise of a peculiarly governmental power or obligation.

In addition to the reasons set forth above, this conclusion is further supported by the fact that the four principal guidelines used in determining whether an individual is a public official for purposes of immunity, as set forth in *James, supra,* were the same guidelines used in decisions by the Court of Appeals interpreting the term "public office" within the meaning of the Maryland Constitution. In *Nesbitt v. Fallon,* 203 Md. 534, 544, 102 A.2d 284 (1954), the Court held that a member of the Board of License Commissioners of Anne Arundel County held a "civil office" within the meaning of Article 2, §§ 10 and 13 of the Maryland Constitution, and further held that a "civil office" was synonymous with a "public office." The Court used the same four guidelines mentioned above, as had been previously defined in *Buchholtz v. Hill,* 178 Md. 280, 13 A.2d 348 (1940). The Court stated that the most important guideline (of the four) is whether the individual "is entrusted with a part of the sovereign power to exercise some of the functions of government for the benefit of the people." *Id.* at 544, 102 A.2d 284. In *Board of Supervisors v. Attorney General,* 246 Md. 417, 229 A.2d 388 (1967), the Court had before it the question of whether a delegate to the State Constitutional Convention held "public office" so as to be forbidden from holding another office for profit or trust in violation of the State Constitution. The Court stated that the individual was

not delegated any sovereign power of the State, *i.e.*, any part of the sovereignty delegated by the people through their Constitution to the executive, legislative, or judicial branches. *Id.* at 439–40, 229 A.2d 388; *see Hetrich v. County Comm'rs*, 222 Md. 304, 159 A.2d 642 (1960); *Buchholtz, supra.* The *Buchholtz* line of cases clearly holds that, in order to satisfy the element of exercising part of the sovereignty of the State, one must perform a function that is peculiarly governmental in nature.

The result reached herein is further supported by accepted rules of statutory construction. In our view, under the plain language of the Act, subsection (1) applies to *employees* without the qualification of whether they are exercising a part of the "sovereignty of the State," and subsection (4) applies to *any individual,* including non-employees, who exercise a part of the "sovereignty of the State." If all State employees were held to exercise some part of the State's sovereignty merely by virtue of being employed by the State, then employees would be included in subsection (4) and subsection (1) would be superfluous. Consequently, it follows that, in order to exercise some part of the "sovereignty of the State," more is required than doing some act for or on behalf of the State.

Moreover, if appellant's position is correct, then the State would have waived immunity in subsection (4) with respect to tortious acts committed by all persons for whom the State is liable in tort. If the Legislature had intended to waive immunity in all actions in which the State is liable, it could have done so clearly and unequivocally. In fact, the waiver of immunity is limited and the scope of waiver is not synonymous with the State's liability in tort. We are mindful of the Legislature's admonition that the Act should be liberally construed, but we must interpret and apply the law as enacted.

To find that an individual exercised part of the sovereignty of the State when not employed by the State, when not performing a governmental function, and in the

absence of a constitutional violation, would make any person furthering some business of the State "State personnel." [9] This would make the scope of waiver of immunity synonymous with a basis for tort liability and would be inconsistent with the legislative intent.

The Legislature granted immunity to "State personnel" pursuant to C.J., § 5–399.2(b). If "State personnel" perform a negligent act, for which the State has waived immunity, then "State personnel" are immune from suit. Consequently, because the individuals who performed the tortious acts in this case and their employer, Basil, were not "State personnel," they were not immune from suit. We note that the contract between the State and Basil required Basil to indemnify the State against liability for claims relating to performance under the contract and required Basil to carry liability insurance in certain minimal amounts. Thus, appellant was not left without recourse or remedy. Unfortunately for him, he did not timely file his action against Basil.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

---

9. Appellant argues that the Eighth Amendment to the United States Constitution gives rise to a duty by the State to provide medical care to inmates. This argument, apparently, is made to support the position that the State owes a non-delegable duty to inmates to provide a basis for tort liability. *See* discussion *supra* pp. 481–482. Additionally, a complaint that a health care provider negligently diagnosed or treated a medical condition is not a valid claim under the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). The medical malpractice does not rise to the level of a constitutional violation even if the injured party is a prisoner. *Id.* Appellant also argues that the health care providers in question were acting under color of State law for purposes of 42 U.S.C. § 1983 and cites *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), in support thereof. There is no claim under § 1983 in this case, and the question of whether an individual is acting under color of State law for that purpose has no relevance to whether an individual is "State personnel" within the meaning of the Act. *See Rucker,* 316 Md. at 280, 558 A.2d 399.