**Gen. 133]**                                                                          **133**

## OFFICE OF PROFIT

**LABOR LAW – STATUS OF LABOR RELATIONS ADMINISTRATORS FOR PURPOSES OF PROHIBITION ON DUAL OFFICE-HOLDING**

August 25, 2014

*The Honorable Isiah Leggett*
*County Executive*

You have requested our opinion on whether Maryland law precludes a person from simultaneously serving as a Labor Relations Administrator for Montgomery County, a member of the "Impasse Panel" of the Prince George's County Public Employee Relations Board, and a Labor Relations Administrator for the Washington Suburban Sanitary Commission. Specifically, you ask whether two or more of these positions constitute an "office of profit" within the meaning of Article 35 of the Maryland Declaration of Rights such that a person could not serve in more than one of these roles at the same time.

In our opinion, a member of the Impasse Panel of the Prince George's County Public Employee Relations Board does not hold an office of profit. The Labor Relations Administrator for Montgomery County, however, does hold an office of profit, as does the Labor Relations Administrator for the Washington Suburban Sanitary Commission. Accordingly, a person could serve on the Impasse Panel and as a Labor Relations Administrator, but could not concurrently serve as a Labor Relations Administrator for both Montgomery County and the Washington Suburban Sanitary Commission.

## I

## Background[1]

Article 35 of the Maryland Declaration of Rights provides, in pertinent part, that "no person shall hold, at the same time,

---

[1] In accordance with the rules governing the process of requesting an opinion, you have provided us with the County Attorney's memorandum on the question posed here. The Montgomery County Career Fire Fighters Association, by its counsel, has also submitted a memorandum.

more than one office of profit, created by the Constitution or Laws of this State." Your question arises because a Labor Relations Administrator ("LRA") appointed to enforce and administer Montgomery County's Fire and Rescue collective bargaining law has also been appointed to serve on the Impasse Panel of the Prince George's County Public Employee Relations Board and is under consideration for appointment as an LRA for the Washington Suburban Sanitary Commission.

## A.    Montgomery County's LRA

Montgomery County's LRA enforces and administers the Fire and Rescue collective bargaining law under sections 33-147 through 33-157 of the Montgomery County Code ("MCC"). The LRA has the authority to "hold hearings and make inquiries, administer oaths and affirmations, examine witnesses and documents, take testimony and receive evidence, and compel by issuance of subpoenas the attendance of witnesses and the production of relevant documents." MCC § 33-149(a)(3). The LRA has the authority to issue a final decision on any prohibited practices specified in the County Code, which decision may be appealed to the Circuit Court for Montgomery County. MCC § 33-154(e)-(g). The LRA serves for a five-year term. MCC § 33-149(c). An incumbent LRA is automatically reappointed for another five-year term unless the certified union representative or employer objects before the initial term expires. *Id.* The LRA is paid a daily fee while handling collective bargaining matters and is reimbursed for expenses. MCC § 33-149(e).

## B.    WSSC's LRA

The LRA for the Washington Suburban Sanitary Commission ("WSSC") enforces and administers the collective bargaining laws that apply to WSSC's employees. The LRA has authority over the process by which employees choose an exclusive representative for collective bargaining purposes. Md. Code Ann., Pub. Util. ("PU") § 18-205 (2010, 2013 Supp.). The LRA may also resolve disputes over the eligibility of employees for inclusion in a bargaining unit and may hold evidentiary hearings and issue final decisions in those matters. PU § 18-206. The LRA determines the propriety of disciplinary action imposed on employees who engage in a strike, work stoppage, or slowdown and may conduct a hearing on whether to revoke the certification of an employee organization found to have assisted or authorized such actions. PU § 18-215. The LRA also has authority to adjudicate unfair labor practice charges filed against the Commission or an employee organization, including the

ability to conduct hearings. In this capacity, the LRA may issue findings of facts and conclusions of law, issue cease and desist orders to parties found to have engaged in an unfair labor practice, and order relief necessary to remedy any violations. PU § 18-216(d). Remedies could include reinstatement, restitution, back pay, or any other remedy designed to restore the employee, employee organization, or WSSC to the place it had been in before the violation. *Id.* The LRA's decision is final; an aggrieved party's only recourse is judicial review. PU § 18-216(g).

The LRAs for WSSC serve for designated terms, generally three years.[2] PU § 18-203(a) and (b). The statute does not expressly provide for the compensation of LRAs. Instead, it states only that costs in certain matters are to be shared equally between WSSC and the employee organization. *See* PU §§ 18-205(g) (elections), 18-206(d) (eligibility hearings), 18-216(h) (unfair labor practice proceedings). WSSC counsel has stated, however, that LRAs are compensated for the work they do when they preside over a hearing or otherwise exercise their authority. *See* Memorandum of Montgomery County Attorney Marc P. Hansen to Hon. Isiah Leggett, Montgomery County Executive, at 9 (Dec. 11, 2013).

### C. *Member of the Prince George's County PERB Impasse Panel*

The Prince George's County Public Employee Relations Board ("PERB") is composed of three separate panels with responsibility over (a) representation matters; (b) unfair labor practices and negotiability disputes; and (c) impasse disputes, respectively. Prince George's County Code ("PGCC") § 13A-104(a). The panels do not "act as single bodies except for the purposes of electing their chairmen and to make, amend, and

---

[2] The Revisor's Note to PU § 18-203 states that the Washington Suburban Sanitary Commission's Law Review Committee has notified the General Assembly of its view that the statutory language on the length of an LRA's initial term is "vague." The WSSC committee pointed out for the General Assembly's consideration that it is "unclear" whether all LRAs must have an initial one-year term before being reappointed to a three-year term or whether the one-year term provision applies only to the initial LRA. The ambiguity does not affect our analysis here.

rescind such rules and regulations as may be necessary to carry out" the collective bargaining law. *Id*. § 13A-104(b). "At all other times each panel serves merely as the list of third parties eligible to deal with the disputes." *Id*.

Members of the Impasse Panel are called upon to mediate disputes that occur when an employer and the representative of an employee organization fail to reach a collective bargaining agreement. Each panel member has the authority to hold hearings and "make inquiries as he deems necessary to carry out properly his functions and powers." PGCC § 13A-104(e). This includes the authority to "administer oaths and affirmation[s], examine witnesses and documents, take testimony and receive evidence, [and] compel attendance of witnesses and the production of documents by the issuance of subpoenas." *Id*. Panel members lack the authority to "impose a final and binding settlement on the parties" except in limited circumstances, and even then the settlement must be submitted to the County Council for approval. PGCC § 13A-111(a)(2). By contrast, the other two panels within the PERB—those that handle representation matters and unfair labor practices and negotiability disputes—render decisions that are not referred to the County Council for final approval. *See* PGCC §§ 13A-105 through 107; 13A-114(e).

Members of the Impasse Panel are appointed by the County Executive and confirmed by the County Council. PGCC § 13A-104(a). They serve a two-year term and may be reappointed for additional terms. *Id*. Panel members are "compensated at a rate to be determined by contract between the members and the County." *Id*.

## II
## Analysis

Article 35 of the Declaration of Rights is one of several Maryland constitutional provisions that limit dual office-holding. *See*, *e.g.*, Md. Decl. of Rights, Art. 33; Md. Const., Art. I, § 9, Art. III, § 11; *see also* Report of the Task Force to Study Dual Office Holding ("Task Force Report"), at 5-10 (1995) (listing and discussing Maryland's dual office prohibitions). The purpose of these provisions is "to protect against conflicts of interest, self aggrandizement, concentration of power, and the blurring or obliteration of the doctrine of separation of powers in the performance by the agents of the people of their delegated authorities to exercise the executive, legislative and judicial functions

of the organized government." *Board of Supervisors v. Attorney General*, 246 Md. 417, 428 (1967).[3]

The Court of Appeals has approached Article 35 questions by posing two separate inquiries: First, is the position one "of profit?"; and, second, does the position constitute an "office?" *See*, *e.g.*, *Howard County Metropolitan Comm. v. Westphal*, 232 Md. 334, 339 (1963).

### A. Position "of Profit"

The Court of Appeals has defined the term "of profit" broadly to mean any office to which "fees, salary or other compensation is attached." *Moser v. Board of County Comm'rs*, 235 Md. 279, 283 (1964). It does not matter whether the person actually receives compensation, only whether the position is one that would normally convey payment. *Westphal*, 232 Md. at 340. Any amount of compensation is sufficient to make the office one of profit; "[t]he amount received is immaterial." *Moser*, 235 Md. at 283.

The Montgomery County LRA and a Prince George's County Impasse Panel member plainly hold positions "of profit." Both are entitled to compensation under their respective County Codes, and both are paid from county funds. *See* MCC § 33-149(e); PGCC § 13A-104(a); Letter from Molly A. Elkin, Counsel to the Montgomery County Career Fire Fighters Association to Attorney General Douglas F. Gansler at 3 (Dec. 11, 2013).

WSSC's LRA also holds a position of profit. Although the Public Utilities Article of the Maryland Code does not explicitly state whether WSSC's LRA is entitled to compensation, it does require the parties to share the costs of certain matters. *See* PU §§ 18-205(g) (elections), 18-206(d) (eligibility hearings), 18-216(h)

---

[3] The common law incompatible position doctrine similarly prohibits dual office-holding, but is not applicable here. The incompatible position doctrine looks to "whether there is a present or prospective conflict of interest, as where one office is subordinate to the other or subject to supervision by the other, or where the incumbent of one office has the power to appoint or remove or to set the salary of the other." *Hetrich v. County Comm'rs of Anne Arundel County*, 222 Md. 304, 308 (1960). There is no indication that any of these positions would be subordinate to one another in any respect.

(unfair labor practice proceedings). According to WSSC's counsel, the LRA receives compensation for the times during which he or she presides at a hearing. All three positions are thus positions "of profit."

### B.   Position that is an "Office"

The Court of Appeals has addressed the question of whether a position constitutes an "office," both for Article 35 and for other purposes, through four "guidelines":   (1) whether the position "was created by law and involves duties continuing and not occasional"; (2) whether the incumbent "performs an important public duty"; (3) whether the position "calls for the exercise of some portion of the sovereign power of the State"; and (4) whether the position has "a definite term, for which a commission is issued and a bond and oath are required." *Muthukumarana v. Montgomery County*, 370 Md. 447, 479 (2002); *see also Conaway v. State*, 108 Md. App. 475, 494 (1996) (noting that the Court has used the guidelines for both sovereign immunity and Article 35 purposes). These guidelines are not "conclusive," *D'Aoust v. Diamond*, 424 Md. 549, 587-88 (2012); rather, the determination of whether a position constitutes an "office" must be made in light of "the facts and circumstances in each case and the nature and effect of the particular provision of law by which the office was created." *Moser*, 235 Md. at 281; *see also de la Puente v. County Comm'rs*, 386 Md. 505, 512 (2005) (for purposes of common-law immunity, stating that "[t]hese four guidelines . . . are employed using the specific facts and circumstances of each individual's position").

Still, the Court has considered the "ultimate test" to be whether the position "has been created by law and casts upon the incumbent duties which are continuing in their nature and not occasional and call for the exercise of some portion of the sovereignty of the State." *Hetrich*, 222 Md. at 307. We therefore begin with these two guidelines, which we discuss in three parts: whether the position was created by law; whether it involves duties that are continuing; and whether it calls for the exercise of sovereignty.

#### 1.   Whether the Position Was Created By Law, and, Specifically, By "the Constitution or Laws of this State"

The Court's first "guideline" is that the position be "created by law." This guideline pertains to the requirement in Article 35 that the "office of profit" be "created by the Constitution or Laws

of this State." The position of LRA for the Washington Suburban Sanitary Commission is unquestionably established under State law: the Public Utilities Article of the Maryland Code. *See* PU § 18-203. The other two positions are established under county law: the Montgomery and Prince George's County codes.

The courts have not addressed whether Article 35 applies to positions created under local government enactments, as opposed to Acts of the General Assembly. Read in a vacuum, the phrase "Laws of this State" could be interpreted to exclude laws enacted by local governments, especially when the phrase, as used elsewhere in the Constitution, refers only to Acts of the General Assembly. *See*, *e.g.*, Md. Const. Art. III, § 29 (providing that "[t]he style of all Laws of this State shall be, 'Be it enacted by the General Assembly of Maryland.'"). For purposes of sovereign immunity under the common law, however, the Court has stated that "law" refers more generally to "Constitutional or legislative enactment, such as a statute or local ordinance . . . ." *de la Puente*, 386 Md. at 512. Accordingly, in applying the guideline to determine whether a defendant was a "public officer" for sovereign immunity purposes, both appellate courts have recognized positions created by county codes as positions "created by law." *Id.* at 513 n.8 (stating that the position of commissioner of the Frederick County Parks and Recreation Commission "may be said to have been created by law, to wit, the County Code"); *Biser v. Deibel*, 128 Md. App. 670, 679 (1999) (holding that two positions established by the Town Code of Bel Air were "created by law").

We see little reason why the analysis of what constitutes an "office" under Article 35 should be any different from that which applies within the context of sovereign immunity. The Court of Appeals typically applies the same guidelines when evaluating any of the constitutional provisions that hinge on a person's status as a public office-holder. *See*, *e.g.*, *Conaway*, 108 Md. App. at 494 (comparing *James v. Prince George's County*, 288 Md. 315, 324 (1980) (applying guidelines in context of sovereign immunity), and *Nesbitt v. Fallon*, 203 Md. 534, 544 (1954) (applying guidelines to determine whether position is a "civil office" under Article II, §§ 10 and 13)).

Moreover, recent legislative treatment of Article 35 suggests that the phrase "Laws of this State" has traditionally been understood to encompass offices created by local law. In 1995, the General Assembly adopted a Joint Resolution that noted the

"inherent unfairness" of the constitutional dual-office prohibitions and stated that the prohibitions "place an onerous burden on people who have chosen careers of protecting lives and fighting fires, *and on municipal officers*." Joint Resolution No. 7 (1995 Session) (emphasis added). The Legislature therefore asked the Governor to appoint a task force to study the need for a constitutional amendment and report its findings to the Governor and General Assembly. *Id.* In its report, the resulting Task Force to Study Dual Office Holding explained the effect that had been given to the phrase "created by the Constitution or Laws of this State":

> To a small degree, this language limits the reach of [the Article 35] dual office prohibition, *viz*., to posts of statutory or constitutional origin. It has been relied upon to exclude common law officers, such as deputy sheriffs, and singular positions, such as delegates to a constitutional convention, from the operation of Article 35. *It does not mean that only State, as opposed to local, officers are covered by the ban*.

Task Force Report at 10, n.6 (emphasis added). Attached as appendices to the report were advice letters in which then-Counsel to the General Assembly Robert A. Zarnoch variously advised that a county police officer, a county firefighter, and certain town managers held "offices of profit" for purposes of Article 35. Letter to Sen. Nancy L. Murphy (March 17, 1993); Letter to Delegate-Elect James E. Malone (Dec. 14, 1994); Letter to Sen. Idamae Garrott (Sept. 15, 1993).

In 1996, the General Assembly adopted, and the electorate ratified, an amendment to Article 35 to provide that "[n]onelected membership . . . in a law enforcement agency, a fire department or agency, or rescue squad shall not be considered an office of profit within the meaning of this Article . . . ." 1996 Md. Laws, ch. 80 (ratified Nov. 5, 1996). The General Assembly thus understood Article 35 to apply to positions created by the enactments of local governments, and the amendment it adopted reflected its preferences, later ratified by the voters, as to which local positions should be exempt from the dual-office-holding prohibition stated by the article.

The General Assembly's understanding in 1995 and 1996 that Article 35 applies to local positions merely continued the long-standing effect of the prohibition. Before the Constitution

was amended to grant certain home-rule powers to counties and municipalities, non-constitutional local positions that were created "by law" were created by an enactment of the General Assembly,[4] and so Article 35 applied to many local officers. *See*, *e.g*, *Hetrich*, 222 Md. at 307 (noting that the position of county business manager was created by an act of the General Assembly and holding that it was an office of profit). We have seen nothing to suggest that the home-rule amendments were intended to license local officers to occupy multiple offices of profit; to the contrary, when the General Assembly has wished to exempt certain classes of officers from the article, it has adopted (and the voters have ratified) exemptions that do so expressly.[5] Moreover, it does not appear to us that the concerns that led to the retention of the dual-office prohibitions in the Maryland Constitution since 1776—"conflicts of interest, self aggrandizement, concentration of power," and the "blurring" of the doctrine of the separation of powers—would evaporate for officials whose positions are created by local ordinance. *See Board of Supervisors*, 246 Md. at 428. It has therefore long been our view that an "office of profit" created by a local government's enactment is subject to Article 35. *See*, *e.g.*, Opinion No. 94-001, 21:8 Md. Reg. 619 (Jan. 5, 1994), 1994 Md. AG LEXIS 72, *2, 14 (unpublished) ("concur[ring] entirely" with conclusion reached by the Anne Arundel County Attorney that "the inhibitions of Article 35 of the Declaration of Rights apply equally to offices of profit created by counties and municipalities"); 68 *Opinions of the Attorney General* 358, 359 (1983); 59 *Opinions of the Attorney General*

---

[4]   Some positions were instead created under the common law and hence were not subject to Article 35. *See*, *e.g.*, *Turner v. Holtzman*, 54 Md. 148, 159 (1880) ("office of deputy or under sheriff is a common law office"); 27 *Opinions of the Attorney General* 287 (1942) (holding that the deputy sheriff in Dorchester County held a position created by common law).

[5]   Article 35 has been amended over the years to specify that certain positions are not "offices of profit." For example, after the Court of Appeals held that the article disqualified a notary public from serving as a member of a metropolitan commission, *Moser*, 235 Md. at 280, the General Assembly amended Article 35 to provide that the "position of Notary Public shall not be considered an office of profit within the meaning of this Article." 1964 Md. Laws, ch. 129 (ratified Nov. 3, 1964). None of the positions about which you ask falls within the exclusions.

109, 119 (1974).[6] We therefore conclude that all three positions meet the "created by law" criterion.

### 2. The Second Part of the "Ultimate Test": The Continuing Nature of the Position

The Maryland courts have often recited the requirement that an office must involve duties that are "continuing in nature and not occasional," but only once has a position been deemed so "occasional" as to fail the test. In *Board of Supervisors*, the Court of Appeals likened a delegate to the 1967 constitutional convention to a "male honeybee" in that the delegate "performs his creative duty and then ceases to exist as a public functionary." 246 Md. at 439-40. Noting the rarity of constitutional conventions in Maryland history, the Court stated that "the making of a constitution which, like the century plant, has taken a hundred years to bloom may fairly be said to be occasional." *Id.* at 440. The Court concluded that "[t]he idea of continuity contemplated by the ordinary test for an office is lacking." *Id.* at 439-40. In other contexts, the Court has distinguished the continuity and permanency of the *office itself* from the amount of time a specific individual spends *exercising the duties* of the office. *See Lilly v. Jones*, 158 Md. 260, 268-69 (1930) (noting that, in the context of the incompatibility of offices doctrine, the focus is "not upon what is done, or likely to be done, by the

---

[6] On the suggestion of counsel for the Montgomery County Career Fire Fighters' Association, we compared Article 35 of the Declaration of Rights to Article 15 to consider whether the inclusion of counties in Article 15, but not in Article 35, could shed light on whether the framers considered the phrase "created by the . . . Laws of this State" to include laws passed by the counties and municipalities. This comparison was ultimately unhelpful. When Articles 15 and 35 were originally drafted, neither included a reference to counties. Article 15 originally applied to taxes "to be levied by the State," and it was amended in 1914 to apply also to taxes levied "by the Counties." 1914 Md. Laws, ch. 390. That year, the General Assembly also adopted, and the voters ratified, the constitutional amendment that granted home rule powers to counties that chose to adopt a charter. *Id.*, ch. 416; Md. Const. Art. XI-A. In our view, the fact that the General Assembly did not also adopt a change to Article 35 to reflect the possibility of local enactments does not indicate its intent to exclude locally-created officers from the prohibition. Instead, that fact, along with the 1996 amendments to exclude some local officers, could lead to an inference that the General Assembly did not consider such a change necessary to continue the applicability of the prohibition to local offices.

incumbent in the performance of his duties, but what he may do under the power conferred upon him").

We applied these principles in 65 *Opinions of the Attorney General* 381 (1980), where we concluded that the position of election judge met the "continuity test" because the election judges had set terms of office and were on call for any election during their terms. *Id*. at 383. In arriving at that conclusion, we turned to a treatise for guidance in applying the "continuity test":

> The elements of tenure and duration as requisites of a public office have been held to relate to the office itself, and not to the incumbent. In other words, the requirement that the position have some permanency and continuity has been considered to mean merely that the office itself have some permanency and continuity.

*Id.* (quoting 67 C.J.S. Officers § 8, which now appears at § 15 of the 2012 edition). The Task Force to Study Dual Office Holding summarized the rule succinctly: "[T]he actual exercise of [the] powers is irrelevant to the public office inquiry. Rather, the focus is on what the law authorizes the position to do." Task Force Report at 11, n.7.

The three positions at issue here clearly are not full-time positions, and the duties they involve might seem to be "occasional" in the ordinary sense of that word. Generally, the incumbents' duties involve addressing labor disputes. If no disputes are pending, then there are no duties to be performed. As a result, the frequency with which the incumbents perform their duties will necessarily vary. However, the question is not the frequency with which the incumbents actually perform their duties, but the continuity of what each "may do under the power conferred on him." *See Lilly*, 158 Md. at 268-69. Unlike the constitutional convention delegate who "cease[d] to exist as a public functionary" after the convention, the three incumbents of these positions hold terms for a set period of time and have varied duties depending on the nature of the issues that arise. Like the election judges whose positions we addressed in 65 *Opinions of the Attorney General* 381, these officers are continuously available, during their terms, to perform duties when the need

arises. The respective roles as LRAs and Impasse Panel members are thus continuing, whether or not the need arises.[7]

We conclude that the incumbents of all three positions perform duties that are continuing in nature and not occasional. In our view, all three positions meet this guideline.

### 3. The "Most Important Characteristic": Whether the Incumbent "Exercises Some Portion of the Sovereign Power of the State"

The Court of Appeals has instructed that "[t]he most important characteristic of a public office, as distinguished from any other employment, is the fact that the incumbent is entrusted with a part of the sovereign power to exercise some of the functions of government for the benefit of the people." *Buchholtz v. Hill*, 178 Md. 280, 283 (1940); *see also Nesbitt*, 203 Md. at 544 (same). The Court has broadly defined the concept of "sovereign power" as "any part of the sovereignty delegated by the people through their constitution to the executive, legislative or judicial branches of the government." *Board of Supervisors*, 246 Md. at 440.

An individual exercises "sovereign power" when he or she exercises some function of government "that can be validly performed only pursuant to a specific grant of government power." 79 *Opinions of the Attorney General* 378, 380 (1994) (citations and quotation marks omitted). The position must not be "purely ministerial"; it must be substantive and call for the

---

[7] In a previous Opinion concluding that membership on the State Prosecutor Selection and Disabilities Commission constituted an "office of profit" subject to Article 35, we acknowledged that "[w]e might be constrained to conclude that the duties of a member of the Commission are occasional rather than continuing if the only duty of the Commission were to nominate the State Prosecutor since this duty occurs only in the event of an actual or imminent vacancy in the office and upon notification to the Commission by the Governor." 60 *Opinions of the Attorney General* 121, 128 (1975). Ultimately, however, we quoted and followed *Lilly*: "The question . . . should be determined, not upon what is done, or likely to be done, by the incumbent in the performance of his duties, but what he may do under the power conferred upon him." *Id*. at 129 (quoting *Lilly*, 158 Md. at 268-69). In any event, the officers we discuss here, when called upon, exercise powers of greater duration than the occasional—and likely one-time—nomination power we hypothesized in our earlier opinion.

exercise of judgment and discretion. *Id.* Moreover, a person must exercise sovereignty "in his own right" (*i.e.*, not "under the direction and control of superiors," *Westphal*, 232 Md. at 340) and "for the benefit of the public," 57 *Opinions of the Attorney General* 266, 269 (1972).

The Court of Appeals has held that the statutes applicable to a deputy State auditor did not delegate any part of the State's sovereignty to him because the statutes made only one "mention or indication of the deputy acting in his own official right or name," and even in that instance provided that "he is to act only under the direction of his superior." *Gary v. Board of Trustees of Employees' Retirement System*, 223 Md. 446, 452 (1960). We too have applied these principles to particular positions, and our opinions have frequently turned on the nature of the decisions that the person may make "in his own right." For example, we concluded that a county attorney for Anne Arundel County held an office of profit because the attorney had the authority to administer oaths, issue subpoenas, and administer the county's self-insurance fund, including the ability to adopt rules and regulations for the operation of that fund. 79 *Opinions of the Attorney General* at 381-82; *see also* 60 *Opinions of the Attorney General* 530, 531 (1975) (presiding at disciplinary hearings and conducting hearings related to personnel grievances with "full authority to make decisions" is sovereign); 57 *Opinions of the Attorney General* 595, 601-03 (1972) (rulemaking power is "an authority of sovereign dimensions"). By contrast, we advised that a State personnel hearing officer who also had the authority to issue subpoenas, administer oaths, and "adjudicate" disciplinary matters did not exercise sovereign power because that employee worked under the supervision of another State employee, and his decisions were subject to "approval, rejection or modification" by the department secretary. 57 *Opinions of the Attorney General* at 268; *see also* 72 *Opinions of the Attorney General* 281, 284 (1987) (standing examiner appointed by circuit court not an "office of profit or trust," despite having the power to issue subpoenas, when examiner "renders no final decisions").

Here, both of the LRAs may make final decisions in their own right, subject only to judicial review. *See* MCC § 33-154(e)-(g) (Montgomery County LRA); PU § 18-206 (WSSC LRA). We therefore conclude that they exercise a part of the State's

sovereign powers.[8]  By contrast, a member of the Impasse Panel of the Prince George's County PERB lacks the authority, except in limited circumstances, to impose a binding and final settlement on the parties.  PGCC § 13A-111(a)(2).  Those circumstances are when the parties mutually agree to a settlement or the Impasse Panel has denied a labor organization the right to strike and has required the parties to undergo compulsory arbitration.  *Id*.  Even then, the Impasse Panel's decision must be submitted to the County Council for approval.  *Id*.

That the Impasse Panel does not have authority to render final and binding settlements suggests that a panel member—like the State personnel hearing officer whose decisions were subject to the department secretary's approval, *see* 57 *Opinions of the Attorney General* 266—does not meet the "most important characteristic" of having been "entrusted with a part of the sovereign power."  *Cf. Nesbitt*, 203 Md. at 544.  In reaching this conclusion, we recognize that a panel member does not serve under the "direction and control" of an agency supervisor in the same manner as the hearing officer in our earlier opinion.  57 *Opinions of the Attorney General* at 268-69.  We believe, however, that the lack of authority to render a final and binding decision is the more important consideration here.  *See Cohen v. Goldstein*, 58 Md. App. 699, 714 (1984) (noting that the conclusion in *Matter of Anderson*, 272 Md. 85 (1974), that circuit court masters are empowered only to make recommendations to a judge, "wiped away" the notion that the master is "an official of the State"); 72 *Opinions of the Attorney General* at 284 n.4 (stating that, in light of *Anderson* and *Cohen*, our prior opinion

---

[8]  Although we recognize that the LRAs perform much the same role as do third-party mediators in private sector labor disputes, that fact is not material.  Private entities can offer and perform services that governments perform, but so long as a government entity has been charged with a particular function, its authority to perform those duties stems from its sovereignty.  *Cf. Rios v. Montgomery County*, 386 Md. 104, 128-29 (2005) (citing *Mayor of Baltimore v. Blueford*, 173 Md. 267, 276 (1937)) (outlining the difference between governmental and proprietary functions for purposes of governmental immunity as being whether an act is "sanctioned by legislative authority" and solely benefits the public as opposed to generating profit or private interest for the government).  Because the LRA positions here are "sanctioned by legislative authority," they exercise sovereignty even though their occupants perform the same functions when acting as private mediators.

concluding that the examiner-master is an "office of profit," *see* 50 *Opinions of the Attorney General* 57 (1965), was overruled).

We also wish to distinguish the conclusion in our earlier opinion that personnel hearing officers, because they only presided over internal matters involving State classified employees, did not perform their duties "for the benefit of the public." 57 *Opinions of the Attorney General* at 269. We reach a different conclusion here for two reasons. First, as a factual matter, the public sector labor disputes that LRAs are called upon to resolve—particularly those involving fire and rescue or water and sanitation employees—have a greater potential to affect the general public than the individual employee grievances heard by the State personnel hearing officer. Given the local legislative declarations of how avoiding labor unrest benefits the public, *see infra* at 14-15, we cannot say that the work of the mediators "has no bearing on, nor directly affects, any portion of the general public." *Cf.* 57 *Opinions of the Attorney General* at 269. More importantly, because we had already concluded in our earlier opinion that the State hearing officer did not exercise sovereignty "in his own right," we did not express the view there that a position with duties that have only an "indirect" effect on the general public cannot qualify as an "office of profit" for purposes of Article 35. In fact, we are not aware of any instance in which we or a Maryland court has found this consideration dispositive. That the LRAs render final decisions that are binding on the parties is the more important consideration and here suggests that the positions are "offices of profit."

> **4. The Remaining Guidelines: The Importance of the Duty; the Term of Office, Oath, and Bond**

> **a. "Important public duty"**

The Court has not defined the "important public duty" guideline, which is closely related to the now disused inquiry into whether the position is one of "dignity and importance." *See Duncan v. Koustenis*, 260 Md. 98, 105 (1970) (noting that the "dignity of office" guideline "has been greatly depreciated if not abandoned"). Further, the Court has remarked that the "intangible attributes of dignity and importance" are "relative and their precise values as tests of office somewhat elusive." *Gary*, 223 Md. at 450. Nonetheless, the Court has considered whether certain public positions involve important public duties. *See, e.g., Board of Supervisors*, 246 Md. at 439 ("Certainly a delegate to a

constitutional convention performs a highly important public duty of great dignity."); *Moser*, 235 Md. at 283 (noting that notary publics are "required to perform essential and important duties with integrity"); *Gary*, 223 Md. at 450 (stating that deputy state auditor holds a position of dignity and importance); *de la Puente*, 386 Md. at 513 (accepting parties' concession that county director of parks, capital improvement administrator, recreation superintendent, park superintendent, and safety inspector perform important public duties). The Court did not elaborate on the attributes that made these positions important.

The Montgomery County Code states the County's policy on the importance of bargaining collectively with fire and rescue employees and resolving disputes promptly. *See* MCC § 33-147. As relevant here, MCC § 33-147 declares the County's policy that, "[s]ince unresolved disputes in the fire and rescue service harm the public and fire and rescue employees, adequate means should be available to prevent disputes and resolve them when they occur." *Id.* "To that end," the ordinance declares, "it is in the public interest that fire and rescue employees have the opportunity to bargain collectively over wages, hours, and other terms and conditions of employment . . . ." *Id.* The County Attorney's memorandum states that the "authority and responsibilities accorded the Montgomery County LRA . . . demonstrate the dignity and importance of the functions that [the incumbent performs]," and we see no reason to disagree.

The Prince George's County Code contains a similar policy statement, and the Impasse Panel members' purview extends to all employees, with certain exceptions relating to elected officials and those in management. PGCC §§ 13A-101; 13A-102(g). In adopting the policy, the County Council concluded that, "where public employees have been granted the right to share in the decision-making process affecting wages and working conditions, they have become more responsive and better able to exchange ideas and information on operations with their administrators." *Id*., § 13A-101(a). As a result, "government is made more effective." *Id.* As with the Montgomery County LRA, we see no reason to question the importance of the duties performed by Impasse Panel members.

The Public Utilities Article does not contain a similar statement of purpose, but WSSC's LRA performs duties that are analogous to those of the Montgomery County LRA. The work of WSSC employees also involves essential services; WSSC provides water and sanitation services to customers in Prince George's and Montgomery counties.

The resolution of labor disputes, although ostensibly pertaining only to the employer and the affected employees, can have long-standing impacts on county governments, county employees, and the public that funds their salaries. The LRAs address matters implicating these essential public services; the Impasse Panel members' broader purview includes such matters; and all three have the authority to address collective bargaining matters that affect the employees who provide such services. In our view, all three positions require individuals to perform an important public duty.

### b. Definite Term for which a Commission is Issued, Bond, and Oath

The "definite term" inquiry focuses on whether the person holds a "term of office fixed by statute or ordinance." *See, e.g.,* *Jackson v. Cosby*, 179 Md. 671, 675 (1941) (noting the lack of a fixed term as one indication that a city engineer was not a "public officer"); 65 *Opinions of the Attorney General* 381 (concluding that election judges hold offices of profit, in part, because they have a statutory term of office). Here, all three positions have a set "definite term." The Montgomery County LRA has a five-year term, the Prince George's County Impasse Panel member has a two-year term, and the Washington Suburban Sanitary Commission LRA serves either a one-year or a three-year term, as applicable to the particular appointment. The definite nature of these terms suggests that the positions constitute offices.

None of the three offices requires an oath or bond, which would seem to weigh against the conclusion that they are "offices of profit." But the Court of Appeals has not placed much emphasis on the requirement of a commission, oath, or bond. In *Westphal*, for instance, the Court concluded that members of the Howard County Metropolitan Commission held an office of profit even without having taken an oath, given a bond, or received a commission because they exercised "a large portion of the sovereign power of government." 232 Md. at 340. A few years later, the Court did not address the "commission, bond, or oath" factor at all when it held that a delegate to a constitutional convention did not hold an office. *Board of Supervisors*, 246 Md. at 439-40.

The application of this guideline points slightly towards public officer status, as the fact that these positions carry definite

terms likely weighs more heavily than the fact that none requires an oath or bond.

### 5. Summary and Policy Considerations

Several factors might indicate that an Impasse Panel member of the Prince George's County PERB holds an office of profit: the position is created by law, the incumbent performs an important public duty, and the position is a continuing and not occasional one. The most important factor to be considered, however, is whether the individual exercises some portion of government sovereignty. Impasse Panel members have the authority to hold hearings, administer oaths, issue subpoenas, and compel the attendance of witnesses, but the decisions the members issue are recommendations only; they do not become final unless and until the Prince George's County Council approves them. Impasse Panel members thus do not themselves exercise the governmental power to resolve labor disputes. For this reason principally, it is our opinion that a member of the Impasse Panel does not hold an office of profit.

In contrast, it is our opinion that the LRAs for Montgomery County and the Washington Suburban Sanitary Commission do hold offices of profit. Their positions were created by law, they exercise some portion of government sovereignty in their own right by presiding over labor disputes and issuing final opinions, and they perform important public duties that are potentially continuing and not occasional. Although their positions do not require a commission, oath, or bond, those characteristics are not determinative. Because the LRAs qualify as offices of profit, a person may not hold two such positions at the same time.

We think this conclusion furthers the policies that lie behind the prohibition on dual office-holding. Although simultaneously serving as the LRA in multiple jurisdictions may not raise conflicts of interest or "blur[]" the lines between the executive, legislative, and judicial branches, *Board of Supervisors*, 246 Md. at 428, it would tend to concentrate influence over public sector labor relations. And without a principle limiting such service, one person could, theoretically, serve as the LRA in *all* Maryland jurisdictions. Such a result would allow for the very "self aggrandizement" and "concentration of power" that Article 35 was intended to protect against. *Id.* The conclusion we reach here, though it may require local jurisdictions to expand their search for qualified neutrals, best effectuates the legislative intent by providing a diversity of perspective that might otherwise be lacking.

## III
## Conclusion

The LRAs for Montgomery County and the Washington Suburban Sanitary Commission hold offices of profit while the Impasse Panel members of the Prince George's County PERB do not.  Therefore, a person may not serve as an LRA for both Montgomery County and the Washington Suburban Sanitary Commission.  A person who is an LRA for one of those entities, however, may also serve on the Impasse Panel of the Prince George's County PERB.


Douglas F. Gansler
Attorney General of Maryland


Derek Simmonsen
Assistant Attorney General


Adam D. Snyder
Chief Counsel, Opinions & Advice